IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
---

Renee Thompson,

                Plaintiff,                      OPINION & ORDER

  v.

                                              12-cv-375-wmc

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.
---

Pursuant to 42 U.S.C. § 405(g), plaintiff Renee Thompson seeks judicial review of a final decision of the Commissioner of Social Security. Thompson principally contends that remand is warranted because the administrative law judge: (1) misapplied Acquiescence Ruling 97-4; (2) imposed an improper burden on Thompson to demonstrate her disability; and (3) improperly evaluated the opinion of Thompson's chiropractor. For the reasons set forth below, the case will now be remanded to the Commissioner for rehearing.[1]

**FACTS**

**I. Background**

Thompson is a 59-year-old woman alleging a disability due to lower back and hip pain, as well as fibromyalgia. In 2008, Thompson made several visits to the Marshfield Clinic in Eau Claire, Wisconsin. (AR 265-70.)[2] During these visits, Thompson reported a five-year history of pain in her neck, shoulder, elbow, hand, knee, hip and lower back. (AR 271.) Dr. Marlon Navarro, M.D., who examined Thompson during her initial visits to the Marshfield Clinic, noted that Thompson had a full range of motion throughout her body, good strength in her extremities and a normal gait. (AR 272-74.)

---

[1] Oral argument was heard on February 13, 2014.
[2] The citations in this Opinion are drawn from the Administrative Record. (Dkt. #10.)

Also in 2008, Thompson regularly visited Family Health Associates, in Chippewa Falls, Wisconsin. She was examined by Dr. Jill Hasenberg, D.O. (AR 221-32.) Thompson complained of leg cramps and lower back pain. (*Id.*) Again, exams revealed that Thompson had a full range of motion and no abnormal musculoskeletal function. (*Id.*) Hasenberg recommended that Thompson take Tylenol for her pain. (AR 228.)

Finding Tylenol insufficient, Thompson began treatment with Dr. Brian Hurtgen, a chiropractor on March 6, 2009. She saw Hurtgen a total of thirty times, averaging two or three visits per week until June 17, 2009. (AR 233-64.) According to Hurtgen, Thompson complained of moderately severe pain on the right side of the lumbar spine; sharp, achy pain in the right sacroiliac area, right-lower lumbar area, right sciatic region, right posteriolateral lumbar thigh; constant, moderate pain in the right region of the upper back; and sharp pain in the right medial lower thoracic area and right lumbar area. (AR 237; Pl.'s Br. (dkt. #13) 4.)

At that time, Hurtgen's objective exam indicated:

> (a) right posterior rotational subluxation at T12 was observed. There was also a right inferior deviation with a moderate amount of spinal joint fixation. A right posterior rotational subluxation with right inferior deviation was noted on palpitation at L5 with a moderate amount of spinal joint fixation. The left SI joint show[ed] a subluxation with the ilium in an anterior position with a moderate loss of joint function. The right ilium [was] found to be anterior with a moderate degree of fixation. A right posterior subluxation at the sacrum was observed. There was also a right inferior deviation with a moderate degree of fixation. In the spinal tissues, palpitation revealed a severe pain intensity at L5 and the sacrum on the right and a medium degree of pain at T12 bilaterally. On adjustment, a fair amount of vertebral motion at T12, L5, and the left ilium to the sacrum [was] observed.

(AR 233.) Hurtgen further observed that Thompson had a "decreased lumbar range of motion." (*Id.*)

2

Ultimately, Hurtgen diagnosed Thompson with "displacement of the lumbar intervertebral discs with myelopathy, a lumbar sprain/strain and a sacrum strain/sprain." (*Id.*) Hurtgen's notes also reflect that Thompson's lower back pain worsened throughout the course of his treatment, although there were periods of temporary improvement. (AR 233-64.) In June 2009, Hurtgen referred Thompson to a physical therapist. (AR 268.)

From June 28 to August 21, 2009, Thompson attended five sessions of physical therapy. (AR 288-93.) During her first visit, she reported the same back and hip issues to the physical therapist as previously reported to her medical doctors and chiropractor, except she now indicated that the pain kept her up at night. (AR 293.) While physical therapy helped reduce her pain, Thompson reported that it would return every time she performed normal tasks at work, such as bending or lifting. (AR 289.)

On October 5, 2010, Thompson, again, saw her chiropractor, Dr. Hurtgen. (AR 339.) He opined that Thompson could sit and stand for thirty minutes each and walk for fifteen minutes at one time, but could not sit/stand/walk for eight hours a day. (AR 337.) He also opined that Thompson could not climb ladders or scaffolds, and could lift only five pounds occasionally and never more than ten pounds. (AR 337.) He opined that Thompson would miss at least eight days of work per month. (AR 338.)

## II. Administrative Proceedings

In December 2005, Thompson first applied for Disability Insurance Benefits ("DIB"), describing various workplace injuries to her neck, back, hips and shoulders. (AR 58-60.) On December 24, 2008, an ALJ denied Thompson's claim, determining that her injuries did not amount to a disability. (AR 64-65.) In denying her claim, the ALJ found

3

that Thompson had a residual functional capacity ("RFC") to perform less than a full range of light work. (AR 60.) Thompson did not seek review of that decision.

On July 22, 2009, shortly after being referred by Hurtgen for physical therapy, Thompson filed a second application for DIB. (AR 11.) Her application initially alleged a disability beginning December 23, 2008, but was later amended to allege a disability starting May 1, 2009. (AR 77.) A regional commissioner initially denied her claim on November 16, 2009, and denied her claim again on reconsideration. (AR 66, 71.) Thompson then sought a review before an ALJ. (AR 88.)

On December 1, 2010, the ALJ held a hearing at which Thompson appeared with her attorney. (AR 38.)[3] Thompson testified that her headaches and difficulties sitting, standing, walking, kneeling, lifting, pushing, pulling and reaching severely limited her ability to work. (AR 45-46.) Specifically, she described being unable to work for more than three hours a day, three days a week. (AR 46.) Thompson also offered several exhibits into evidence, including: medical records from Thompson's treatment at the Marshfield Clinic and Family Health Associates and Hurtgen's treatment notes.

In addition, two physical RFC assessments from non-examining state physicians were considered by the ALJ. (AR 2-4, 40.) In November 2009, Mina Khorshidi, M.D., reviewed the medical record and opined that Thompson could occasionally lift fifty pounds, frequently lift twenty-five pounds, sit for six hours in an eight-hour day, and stand/walk for six hours in an eight-hour day. (AR 300.) Khorshidi opined that Thompson could frequently (rather than constantly) stoop, and had no other limitations. (AR 301-03.)

---

[3] This was a different ALJ than the one who presided over her 2008 hearing.

Khorshidi reviewed the results of Thompson's exams, and concluded that "her symptoms are out of proportion [with] medical findings." (AR 306.)

In February 2010, Philip Cohen, M.D., also reviewed the record and agreed with Dr. Khorshidi's conclusions. In addition, Cohen opined that Thompson could only frequently (rather than constantly) crouch and should avoid "concentrated exposure to fumes, orders, dust, gases, etc." (AR 322-25.)

The only person to testify besides Thompson was Ronald Hatakeyama, a vocational expert. (AR 39.) Hatakeyama testified that a hypothetical person of Thompson's age and with her education and work history would be able to perform medium work. (AR 49-50.) In offering his opinion, Hatakeyama was instructed to assume a hypothetical individual who could "frequently do kneeling, crouching, crawling [and] stooping." (AR 50.)

On December 10, 2010, the ALJ issued a decision denying Thompson's claim. (AR 11-20.)[4] The ALJ found that Thompson had not engaged in substantial gainful activity since December 23, 2008, and had only one "severe" impairment: multiple arthralgias of uncertain etiology. (AR 14.) The ALJ further found that Thompson had two "non-severe" impairments: irritable bowel syndrome and asthma. (*Id.*) Based on these impairments and the ALJ's conclusion that the RFC finding from Thompson's 2005 DIB claim was not binding, the ALJ determined that Thompson had an RFC "to perform medium work . . . except she [could] only frequently kneel, crouch, crawl, and stoop." (AR 16.) According to the ALJ, Thompson was "capable of performing past relevant work as a certified nursing

---

[4] The Commissioner states that the ALJ delivered her decision on December 23, 2011. (Def.'s Br. (dkt. #17) 2.) Given that the Commissioner follows this statement with a citation to the decision dated December 10, 2010, the court assumes that the Commissioner inadvertently identified the wrong date in his brief.

assistant and mental retardation aide" because her RFC did not preclude the performance of any work-related activities involved with those jobs. (AR 19.)

Because of her ability to perform past relevant work, the ALJ concluded that Thompson "has not been under a disability, as defined in the Social Security Act, from December 23, 2008, through the date of [this] decision." (AR 20.) Thompson requested a review of the ALJ's decision, but the Appeals Council denied her request. (AR 1, 7.) On May 29, 2012, Thompson filed a timely complaint in this court asking for review of the ALJ's decision. (Compl. (dkt. #1) ¶ 1.)

## OPINION

When a federal court reviews a final decision by the Commissioner of Social Security, the Commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Even so, a district court may not simply "rubber-stamp" the Commissioner's decision without a critical review of the evidence. *See Ehrhart v. Sec'y of Health and Human Servs.,* 969 F.2d 534, 538 (7th Cir. 1992). A decision cannot stand if it lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The ALJ must also explain his "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Id.; see Herron v. Shalala*, 19 F.3d 329, 333–34 (7th Cir. 1994). When the

administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Here, Thompson principally contends that remand is merited because the ALJ: (1) failed to build an "accurate and logical" bridge from the evidence to her conclusion by misapplying Acquiescence Ruling 97-4; (2) employed an improper burden that Thompson had to meet in order to obtain disability status; and (3) improperly evaluated the opinion of Thompson's chiropractor.[5] Because the ALJ's decision is deficient with respect to each of these issues, the court will remand this case for further consideration.

**I. Legal Errors**

If the Commissioner commits an error of law, it is entitled to no deference. *See Schmoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir.1980); *Hayes v. Railroad Retirement Bd.*, 966 F.2d 298, 302 (7th Cir.1992); *Aspros v. Railroad Retirement Bd.*, 904 F.2d 384, 386 (7th Cir.1990). In this case, the ALJ committed three such errors, the cumulative effect of which requires a remand.

The *first error* concerns the ALJ's misapplication of Acquiescence Ruling 97-4.[6] The crux of the Ruling provides that if an ALJ previously ruled that a claimant was not disabled, an ALJ evaluating a subsequent disability claim must apply a presumption of continuing non-disability from the time the previous claim was adjudicated. *Chavez,* AR 97-4(a) (S.S.A. Dec. 3, 1997). The claimant may rebut this presumption by showing that a circumstance surrounding her disability has changed, including her age, the severity of her disability, the

---

[5] In addition, Thompson argued that the ALJ improperly assessed Thompson's credibility and failed to consider the opinion of consultative physician, Dr. Stark. The court provides brief reasoning as to why these two issues do not require remand given the record before the court at this time.
[6] See generally AR 97-4(9) (S.S.A. Dec. 3, 1997). The origins of this Ruling can be found in *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988).

7

existence of an impairment that was not present at the time her previous claim was adjudicated, or a change in the criteria for determining disability status. Once a claimant has rebutted the presumption of continuing non-disability, the ALJ "*must give effect* to certain findings ... contained in the final decision by an ALJ or the Appeals Council on the prior claim, when adjudicating the subsequent claim." *Id.* (emphasis added). More specifically, the ALJ must adopt the findings contained in the previous decision concerning the claimant's age, education, work experience, or RFC, *unless* there is new and material evidence which allows for a different finding. *Id.* (emphasis added).

In Thompson's previous claim for disability in December 2005 (AR 58), the ALJ determined that Thompson retained the capacity to perform *light work*. (AR 58-60.) In the decision now before this court, however, the ALJ determined that Thompson had the RFC to perform *medium* work, except she could "only" frequently kneel, crouch, crawl and stoop. (AR 19.)

As acknowledged by the Commissioner, Acquiescence Ruling 97-4 generally applies to ALJ decisions in the Ninth Circuit, not the Seventh Circuit. Without speculating as to the reasons why the ALJ here applied a Ninth Circuit ruling, the Ruling nevertheless provided the *starting point* for the ALJ's whole analysis of Thompson's claim. Specifically, the ALJ purported to rely on Acquiescence Ruling 97-4 in her decision finding Thompson was not disabled, yet failed to adhere to the earlier finding that Thompson was only capable of light work. This can hardly be considered a logical foundation (let alone a bridge) upon which to build the ALJ's decision. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

On the contrary, had the ALJ determined that Thompson retained the RFC to perform only light work as Ruling 97-4 would appear to presume, she would have been

8

required to find that Ms. Thompson was, in fact, disabled. *See* 20 C.F.R. § 404, Subpart. P, Appendix 2, Rule 202.06 (stating that an ALJ is directed to find disabled a claimant who is of advanced age (55 and older), who possesses a high school education, who has no transferable skills, who is unable to perform their past relevant work, and who is limited to performing light work). As such, the case requires remand at least for a fuller consideration on this issue. *See generally Schmoll*, 636 F.2d at 1150 (where there is an error of law, reversal is warranted notwithstanding the volume of evidence otherwise supporting the ALJ's decision).

The *second error* involved the ALJ's apparent application of an improper burden on Thompson to establish her disability. The ALJ stated that "in order to establish disability … the claimant has the burden of proving an inability to perform any sustained work activity. In other words, she must establish an inability to perform a job where she would be sitting down for a vast majority of the day." (AR 18.) This is an inaccurate statement of the burden carried by Thompson under the regulations. The Commissioner again concedes as much, stating that "[t]o the extent the ALJ suggested [Thompson] needed to show she could not perform sedentary work, the ALJ was mistaken." (Def.'s Br. (dkt. # 17) 10.)

Specifically, the error with placing this burden on Thompson is that as a 56-year-old woman at the time of the ALJ decision, Thompson is defined as a person of advanced age under the statute. Combined with her educational qualifications, this means Thompson need only establish that she was limited to light work. 20 C.F.R. § 404, Subpart. P, Appendix 2, Rule 202.06. To say that Thompson was required to establish an "inability to perform a job where she would be *sitting down for a vast majority* of the day" is to say that she

9

was required to prove that she was incapable of sedentary work, which flies in the face of 20 C.F.R. § 404.

The Commissioner responds that this error was harmless because the ALJ did not require Thompson to *prove* she could not perform sedentary work. The court finds this somewhat cryptic response without legal citation to be unavailing. If anything, the ALJ's reference to the wrong burden further demonstrates she was viewing Thompson's claims with the wrong lens. Indeed, approaching a disability claim under the wrong burden of proof underscores that the ALJ has yet to build a logical bridge for proper review by a district court. *See Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (ALJ failed to build "logical bridge" that allowed reviewing court to assess validity).[7]

The ALJ's *third error* involved improper characterization of evidence proffered by Thompson's chiropractor. The ALJ noted that Dr. Hurtgen is *not* a "medical source," as defined by SSR 06-03p. Conceding that this too was a misstatement of law, the Commissioner once again argues that the mistake was harmless; this time because the ALJ went on to use the appropriate factors to weigh Dr. Hurtgen's opinion. (Def.'s Br. (dkt. #17) 10.) In spite of the Commissioner's contention, which Thompson disputes for reasons that the court addresses below, this mischaracterization of a treating source's evidence -- a source who saw Thompson on at least thirty occasions with respect to her condition -- is not

---

[7] During oral argument, the Commissioner did cite case law to support its position that this second error was harmless. In *United States v. Van Fossan*, 899 F.2d 636 (7th Cir. 1990), a Magistrate Judge had misstated the burden of proof in a criminal matter. The Seventh Circuit found this error was immaterial to the decision because the case was to the bench (being heard by a Magistrate Judge by consent), and any mention of an incorrect burden could not confuse jurors. *Id.* at 638. Moreover, the case was essentially "a swearing contest." *Id.* The circumstances are different here in a number of respects. First, the court found in *Van Fossan* that the misstated burden was plainly a slip of the tongue, not a reflection of the *actual* burden applied by the Magistrate Judge in that criminal case. In contrast, the varied burdens applicable to social security claims and regulations are not nearly as straightforward, nor is the court's confidence here in the ALJ's application of them. Second, when this error is combined with the fact that the ALJ misapplied an Acquiescence Ruling, the errors become increasingly problematic, particularly in circumstances where there is no reasonable explanation for their existence.

so easily dismissed as harmless. Like the other legal errors addressed in this Opinion, no case law is cited by the Commissioner to support the notion that this error is harmless.

While the Commissioner's harmless error argument might have gained traction if but one of these three legal errors were present, the court cannot subscribe to the Commissioner's argument to justify the admitted, multiple legal errors in the ALJ's decision, nor the real possibility of a different outcome if remanded. *Schmoll*, 636 F.2d at 1150.

## II. The ALJ Improperly Discredited the Opinion of Thompson's Treating Chiropractor

Remand is also appropriate because the ALJ did not adequately explain her reasons for dismissing the opinion of Dr. Hurtgen in accordance with SSR 06-03p. Instead, in rejecting Dr. Hurtgen's opinion, the ALJ indicated in boilerplate fashion that she had "considered the nature and extent of the relationship between the source and the individual, the source['s] qualifications, the source's area of expertise, the degree to which the source presents relevant evidence to support his opinion and whether the opinion is consistent with other evidence." (AR 23.) She went on to conclude that Dr. Hurtgen's treating relationship with Thompson was "quite brief" and his reports did not "reveal the type of significant clinical and laboratory abnormalities one would expect if [Thompson] were in fact disabled." (*Id.*)

In reaching this conclusion, the ALJ fails even to acknowledge the fact that Dr. Hurtgen saw Thompson thirty times between March 2009 and June 2009 (or bother to explain why medical opinions from other sources deserved more weight than Dr. Hurtgen's in spite of his more frequent treatment). This, coupled with the fact that the ALJ never

11

expressly assigned any weight to Dr. Hurtgen's opinion (or noted what weight she afforded the opinion relative to other opinions), warrants remand for the reasons that follow.[5]

"Although a claimant has the burden to prove disability, the ALJ has a duty to develop a full and fair record." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (citing *Thompson v. Sullivan,* 933 F.2d 581, 585 (7th Cir. 1991)); *see also Richards v. Astrue*, 370 F. App'x. 727, 731 (7th Cir. 2010) ("[A]n ALJ may not draw conclusions based on an undeveloped record and has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable"); *Smith*, 231 F.3d at 437 (stating that "failure to fulfill this obligation is 'good cause' to remand for gathering of additional evidence").

Here, the ALJ's complete omission of how frequently Dr. Hurtgen treated Thompson -- and evidence directly relevant to this factor -- leaves no "logical bridge" to help the court understand why his testimony was seemingly marginalized by the ALJ. The Ruling in SSR 06-03p directs an ALJ to consider opinions from non "acceptable medical sources" using the same factors for "acceptable medical sources" found in 20 C.F.R. § 404.1527(c). *Phillips*, 413 F. App'x at 884. Attaching special significance to the "frequency" factor, SSR 06-03p notes that "it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' [such as a chiropractor] if he or she *has seen the individual more often than the treating source* and has provided better supporting evidence and a

---

[5] While the ALJ cited SSR 06-03p, she failed to provide adequate application of each factor in the Ruling: "(1) How long the source has known and how frequently the source has seen the individual; (2) How consistent the opinion is with other evidence; (3) The degree to which the source presents relevant evidence to support an opinion; (4) How well the source explains the opinion; (5) Whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) Any other factors that tend to support or refute the opinion." *See* SSR 06-03p. The frequency factor is the most telling and relied upon above to illustrate this deficiency, but other factors are also inadequately developed.

better explanation for his or her opinion." SSR 06-03p (emphasis added). Given this explicit direction and its apparent direct application to Thompson's case, the ALJ's failure to discuss the frequency of Dr. Hurtgen's treatment merits remand.

This court is not alone in requiring ALJs to specify their reasons for rejecting opinions from sources that more frequently interact with a particular claimant. For example, in *Saxon v. Astrue*, 781 F. Supp. 2d 92 (N.D.N.Y. 2011), a federal district court reversed an ALJ who failed to consider the opinions of a treating psychiatrist and a nurse practitioner -- both so-called "non-acceptable medical sources." In *Saxon*, the psychiatrist had seen the claimant twenty-seven times over the span of a little more than a year. 781 F. Supp. 2d at 104. The psychiatrist was the only source who routinely saw and treated the claimant. *Id.* The ALJ's failure to account for how frequently the claimant saw her psychiatrist led the court to conclude that the ALJ had not adequately explained his reasons for dismissing the psychiatrist's opinion. *Id.*

The facts in *Saxon* bear a striking resemblance to the present case. In *Saxon*, the ALJ offered only a summary conclusion as to the deficiencies of the opinion of the claimant's treating psychiatrist. *Id.* While it is true that in Thompson's case, the ALJ went a step further by offering a boilerplate list of factors to use in considering Dr. Hurtgen's opinion, this is a distinction without a difference. In mentioning the *length* of Dr. Hurtgen's treatment, the ALJ inappropriately left out any discussion of the *frequency* with which he saw her. (AR 234-64; Pl.'s Br. (dkt. #13) 16.)

Each of Thompson's thirty visits with Dr. Hurtgen in three months is supported by treatment notes. Most of these notes include: (1) a summary of Thompson's subjective report on her medical condition; (2) a summary of Dr. Hurtgen's objective observations; (3)

13

a list of any tests performed; and (4) Dr. Hurtgen's diagnoses and recommended treatment plans. (*See* AR 233-64; Pl.'s Br. (dkt. #13) 16-17.) Some records also discuss Thompson's overall progress and what restrictions Dr. Hurtgen recommended for her job and daily life. (*See*, e.g., AR 2511, 257, 261, 262.)  Given the importance SSR 06-03p places on how often a source sees a claimant, this court concludes that length and frequency of treatment are factors that necessarily go hand-in-hand.  Discussion of one necessitates discussion of the other; ever more so where there is a dense thicket of evidence, as here, showing a substantial treating relationship (two-three times a week over three months). *Saxon*, 781 F. Supp. 2d at 104.[8]

### III. Remaining Issues

Thompson raises additional issues related to the sufficiency of the underlying proceedings. Because the court finds that the ALJ failed to make an express finding on the weight that should be apportioned to Dr. Hurtgen, much less explained its implicit finding, the court need not and will not address the merits of the ALJ's finding as to Thompson's credibility. Instead, the court will leave this analysis in the first instance to the ALJ on remand, since Dr. Hurtgen's evidence could bolster Thompson's subjective complaints of

---

[8] Of course, there is a difference between a "treating source" and a source with a treating relationship. A "non-acceptable medical source" can never be a "treating source," as the term is defined in 20 C.F.R. § 404.1502. *Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010). This means that Dr. Hurtgen's opinion cannot command controlling weight, regardless of how frequent his contact with Thompson. 20 C.F.R. § 404.1527(c)(2). Accordingly, the court does not disturb this "treating source rule" or suggest that Dr. Hurtgen could qualify as a "treating source." Rather, the court merely recognizes that, consistent with SSR 06-03p, "non-acceptable medical sources" may still have treatment relationships with their patients, and those relationships may make their opinions worthy of consideration in a DIB application. Similarly, the court's holding here should not be construed as a comment on the ultimate outcome on remand, but simply a holding that all of the relevant factors in SSR 06-03p should be balanced, with the frequency factor being part of the overall analysis.

pain and its severity.[9]  Similarly, with respect to Dr. Stark's opinion, the court recommends that the ALJ review his evidence and consider whether it provides any further insight into Thompson's condition.  Given that this evidence dates back to 2006, and Thompson amended her onset date to May 1, 2009, the court would not be surprised to find that the ALJ discounts the relevance of this evidence to Thompson's current disability claim.

Regardless, the court does not intend to suggest the result that should be reached on remand.  Rather, the court encourages the parties, as well as the ALJ, to consider the evidence and the issues anew once the deficiencies noted here are addressed.  *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (on remand, the ALJ should take a "fresh look" at the RFC and vocational questions after the credibility issue has been re-evaluated).

ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying plaintiff Renee Thompson's application for disability benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 8th day of April, 2014.

                              BY THE COURT:
                              /s/
                              WILLIAM M. CONLEY
                              District Judge

---

[9] *See Madrid v. Barnhart*, 447 F.3d 788, 792 (10th Cir. 2006) (when the ALJ's error affected the analysis as a whole, court declined to address other issues raised on appeal); *Mollett v. Astrue*, No. 3:11–CV–238 2012 WL 3916548, at *9-10 (N.D. Ind. Sept. 7, 2012) ("[b]ecause the ALJ's error regarding the hypothetical questions requires remand, the court need not consider the claimant's arguments regarding the remaining issues").